1
2
3
4
5
6
7                    UNITED STATES DISTRICT COURT
8                     EASTERN DISTRICT OF CALIFORNIA
9
10
11
WILLIAM LEON ENSEY,              ) 1:10-cv—00293-LJO-SKO-HC
12                               )
            Petitioner,          )
13                               ) FINDINGS AND RECOMMENDATIONS TO
                                 ) DENY THE PETITION FOR WRIT OF
14     v.                        ) HABEAS CORPUS (DOC. 1), DIRECT
                                 ) THE ENTRY OF JUDGMENT FOR
15  MATTHEW C. CATE,             ) RESPONDENT, AND DECLINE TO ISSUE
                                 ) A CERTIFICATE OF APPEALABILITY
16            Respondent.        )
                                 ) OBJECTIONS DEADLINE:
17  _____    )
                                   THIRTY (30) DAYS
18
19      Petitioner is a state prisoner proceeding pro se and in
20  forma pauperis with a petition pursuant to 28 U.S.C. § 2254.  The
21  matter has been referred to the Magistrate Judge pursuant to 28
22  U.S.C. § 636(b)(1) and Local Rules 302 and 304.  Pending before
23  the Court is the petition, which was filed on February 11, 2010,
24  and transferred to this division on February 20, 2010.
25  Respondent filed an answer on June 23, 2010, along with the state
26  court record.  Petitioner filed a traverse on August 2, 2010.
27      I.  Jurisdiction
28      Because the petition was filed after April 24, 1996, the

                                1

effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the AEDPA applies in this proceeding. <u>Lindh v. Murphy</u>, 521 U.S. 320, 327 (1997), <u>cert. denied</u>, 522 U.S. 1008 (1997); <u>Furman v. Wood</u>, 190 F.3d 1002, 1004 (9th Cir. 1999).

A district court may entertain a petition for a writ of habeas corpus by a person in custody pursuant to the judgment of a state court only on the ground that the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. §§ 2254(a), 2241(c)(3); <u>Williams v. Taylor</u>, 529 U.S. 362, 375 n.7 (2000); <u>Wilson v. Corcoran</u>, 562 U.S. –, –, 131 S.Ct. 13, 16 (2010) (per curiam).

Petitioner claims that in the course of the proceedings resulting in his conviction, he suffered violations of his right to due process of law.  Thus, violations of the Constitution are alleged.  The conviction challenged arises out of the Superior Court of the State of California for the County of Tuolumne (TCSC), which is located within the territorial jurisdiction of this Court.  28 U.S.C. §§ 2254(a), 2241(a), (d).

On May 20, 2010, Respondent's counsel filed a notice of appearance for Respondent Matthew C. Cate, who is the Secretary of the California Department of Corrections and Rehabilitation (CDCR).  Petitioner has thus named as a respondent a person who has custody of the Petitioner within the meaning of 28 U.S.C. § 2242 and Rule 2(a) of the Rules Governing Section 2254 Cases in the District Courts (Habeas Rules).  <u>See</u>, <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 894-95 (9th Cir. 1996); <u>Stanley v. California Supreme Court</u>, 21 F.3d 359, 360 (9th Cir. 1994).

Accordingly, it is concluded that this Court has

2

jurisdiction over the subject matter of this action and over the person of Respondent Cate.

II.   <u>Procedural Summary</u>

On January 18, 2008, information number CRF25795 was filed in the TCSC, charging Petitioner William Ensey and two co-defendants, Rickey Jones and Traci Ann Hawkins, with one count each of second degree burglary in violation of Cal. Pen. Code § 459, and with possession of a forged check with the intent to defraud in violation of § 475(a).  The information further alleged that Petitioner had previously suffered two prior serious or violent felony convictions within the meaning of § 667(b) through (i), and that he had previously served five prior prison terms within the meaning of § 667.5(b).  (1 CT 14-19.)

Jury trial began on May 7, 2008.  The issues of the prior conviction and prison term allegations were bifurcated for the purposes of trial. (1 CT 41-43.)  On May 9, 2008, Petitioner and Traci Hawkins were found guilty as charged. (1 CT 52, 98-99; 3 RT 765-766.)  The jury deadlocked on both counts alleged as to Ricky Jones, and a mistrial was declared as to him. (3 RT 765-768.)

On May 12, 2008, a court trial was held on the special allegations, and they were all found to be true.  (1 CT 100.)

Petitioner was sentenced on June 4, 2008.  Pursuant to a defense motion, the court dismissed one of the prior felony convictions in the interests of justice.  The court selected count I, burglary, as the principal term and imposed the upper term of three years, doubled to six years under the three strikes law.  This sentence was enhanced by consecutive terms of one year

3

1   for each of Petitioner's five prior prison terms.  The court

2   stayed Petitioner's sentence on count II under Cal. Pen. Code §

3   654.  The total term imposed was eleven years.  (1 CT 143.)

4        Petitioner appealed from the judgment of his conviction to

5   the California Court of Appeal, Fifth Appellate District (DCA) in

6   case number No. F055431.  (Lodged Doc. A.)  The DCA issued an

7   opinion in Petitioner's direct appeal on August 3, 2009,

8   awarding Petitioner additional custody credits but otherwise

9   affirming Petitioner's judgment and sentence.  (Lodged Doc. B;

10  Pet., Ex. A, doc. 1, 20-33.)

11       Petitioner filed a petition for review with the California

12  Supreme Court in case number S176054.  (Lodged Doc. C.)  The

13  California Supreme Court denied the petition on October 14, 2009.

14  (Lodged Doc. D.)

15       III.  Standard of Decision and Scope of Review

16       Title 28 U.S.C. § 2254 provides in pertinent part:

17       (d) An application for a writ of habeas corpus on
         behalf of a person in custody pursuant to the
18       judgment of a State court shall not be granted
         with respect to any claim that was adjudicated
19       on the merits in State court proceedings unless
         the adjudication of the claim—

20
         (1) resulted in a decision that was contrary to,
21       or involved an unreasonable application of, clearly
         established Federal law, as determined by the
22       Supreme Court of the United States; or

23       (2) resulted in a decision that was based on an
         unreasonable determination of the facts in light
24       of the evidence presented in the State court
         proceeding.
25
         Clearly established federal law refers to the holdings, as
26
    opposed to the dicta, of the decisions of the Supreme Court as of
27
    the time of the relevant state court decision.  Cullen v.
28

                                    4

1  Pinholster, - U.S. -, 131 S.Ct. 1388, 1399 (2011); Lockyer v.
2  Andrade, 538 U.S. 63, 71 (2003); Williams v. Taylor, 529 U.S.
3  362, 412 (2000).  It is, therefore, the governing legal principle
4  or principles set forth by the Supreme Court at the pertinent
5  time.  Lockyer v. Andrade, 538 U.S. 71-72.

6      A state court's decision contravenes clearly established
7  Supreme Court precedent if it reaches a legal conclusion opposite
8  to, or substantially different from, the Supreme Court's or
9  concludes differently on a materially indistinguishable set of
10 facts.  Williams v. Taylor, 529 U.S. 362, 405-06 (2000).  The
11 state court need not have cited Supreme Court precedent or have
12 been aware of it, "so long as neither the reasoning nor the
13 result of the state-court decision contradicts [it]."  Early v.
14 Packer, 537 U.S. 3, 8 (2002).  A state court unreasonably applies
15 clearly established federal law if it either 1) correctly
16 identifies the governing rule but applies it to a new set of
17 facts in an objectively unreasonable manner, or 2) extends or
18 fails to extend a clearly established legal principle to a new
19 context in an objectively unreasonable manner.  Hernandez v.
20 Small, 282 F.3d 1132, 1142 (9th Cir. 2002); see, Williams, 529
21 U.S. at 407.  An application of clearly established federal law
22 is unreasonable only if it is objectively unreasonable; an
23 incorrect or inaccurate application is not necessarily
24 unreasonable.  Williams, 529 U.S. at 410.

25     A state court's determination that a claim lacks merit
26 precludes federal habeas relief as long as fairminded jurists
27 could disagree on the correctness of the state court's decision.
28 Harrington v. Richter, 562 U.S. -, 131 S.Ct. 770, 786 (2011).

Even a strong case for relief does not render the state court's conclusions unreasonable. _Id._ To obtain federal habeas relief, a state prisoner must show that the state court's ruling on a claim was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." _Id._ at 786-87. The standards set by § 2254(d) are "highly deferential standard[s] for evaluating state-court rulings" which require that state-court decisions be given the benefit of the doubt, and the Petitioner bear the burden of proof. _Cullen v. Pinholster_, 131 S. Ct. at 1398.

In assessing under section 2254(d)(1) whether the state court's legal conclusion was contrary to or an unreasonable application of federal law, "review... is limited to the record that was before the state court that adjudicated the claim on the merits." _Cullen v. Pinholster_, 131 S. Ct. at 1398. Evidence introduced in federal court has no bearing on review pursuant to § 2254(d)(1). _Id._ at 1400. Further, 28 U.S.C. § 2254(e)(1) provides that in a habeas proceeding brought by a person in custody pursuant to a judgment of a state court, a determination of a factual issue made by a state court shall be presumed to be correct; the petitioner has the burden of producing clear and convincing evidence to rebut the presumption of correctness.

IV.   Last Reasoned Decision on the Merits

The last reasoned decision must be identified to analyze the state court decision pursuant to 28 U.S.C. § 2254(d)(1), which limits habeas relief with respect to "any claim that was

6

1  adjudicated on the merits in State court proceedings...."  <u>Barker</u>
2  <u>v. Fleming</u>, 423 F.3d 1085, 1092 n.3 (9th Cir. 2005); <u>Bailey v.</u>
3  <u>Rae</u>, 339 F.3d 1107, 1112-13 (9th Cir. 2003).

4      A state has adjudicated a claim on the merits within the
5  meaning of § 2254(d) when it decides the petitioner's right to
6  relief on the basis of the substance of the constitutional claim
7  raised, rather than denying the claim because of a procedural or
8  other rule precluding state court review of the merits.  <u>Lambert</u>
9  <u>v. Blodgett</u>, 393 F.3d 943, 969 (9th Cir. 2004).  Here, the DCA
10 decided Petitioner's claims on the basis of their substance;
11 thus, the DCA's decision was a decision on the merits.

12     The later decision of the California Supreme Court denying
13 Petitioner's petition for discretionary review of the DCA's
14 decision was not a decision on the merits, but only a
15 determination that the California Supreme Court would not
16 consider the case on the merits.  <u>Williams v. Cavazos</u>, 646 F.3d
17 626, 636 (9th Cir. 2011), <u>petition for cert. filed</u>  80 BNA USLW
18 3282 (Oct. 10, 2011) (No. 11-465) (citing <u>Harrington v. Richter</u>,
19 – U.S. -, 131 S.Ct. 770, 784-85 (2011); Cal. R. Ct. 8.500; and
20 <u>Campter v. Workers' Comp. Appeals Bd.</u>, 3 Cal.4th 679 (1992)).

21      Here, the DCA's decision was the last reasoned decision in
22 which the state court adjudicated Petitioner's claims on the
23 merits.  Where there has been one reasoned state judgment
24 rejecting a federal claim, later unexplained orders upholding
25 that judgment or rejecting the same claim are presumed to rest
26 upon the same ground.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803
27 (1991).
28 ///

This Court will thus "look through" the California Supreme Court's denial of discretionary review to the DCA's last reasoned decision as the relevant state-court determination.  <u>Williams v. Cavazos</u>, 646 F.3d at 636.

V.   <u>Facts</u>

The following factual summary, which is presumed to be correct pursuant to § 2254(e)(1), is taken from the opinion of the DCA in case number F055431.  (Lodged Doc. B.)  <u>See</u>, <u>Galvan v. Alaska Dep't. Of Corrections</u>, 397 F.3d 1198, 1199 n.1 (9th Cir. 2005) (setting forth a factual summary from the state appellate court's decision).

The Parties and Relationships

Appellant was the longtime boyfriend of Traci and thought of Traci as his wife. Traci's two daughters, Rayanne and Sarah, considered appellant to be their stepfather. Jones was appellant's friend and an acquaintance of the other family members. Appellant, Traci and Jones were arrested based on the events at the casino (described more fully hereafter) and were co-defendants in the trial below.

The Travelers Checks

In early December of 2007, Rayanne received an unmarked envelope in the mail with no return address and no cover letter inside. The envelope contained eight counterfeit $500 American Express Travelers Cheques (travelers checks) made out to Rayanne. Rayanne had "no idea" who sent her the checks. Although she was "a little bit" suspicious, she thought the checks could possibly be related to her home-based online business. However, she admitted that she had never before received such a large sum, and that payments had never been in the form of travelers checks or in even denominations. Rayanne gave at least three of the checks to her mother, Traci, which gift was intended for appellant's benefit as well. She also gave one check to her sister, Sarah. Rayanne placed the checks in her grandmother's bedroom in an envelope.

On December 7, 2007, Rayanne attempted to cash one of the travelers checks at Money Mart, a check cashing store. The cashier at Money Mart, Zayra Murillo, became

8

suspicious when she noticed that the travelers check had smeared ink and the color of the check did not look right. She telephoned American Express and verified that the travelers check was counterfeit. Murillo asked Rayanne where she got the check and Rayanne said she obtained it from a local bank. Murillo informed Rayanne that the check was counterfeit and that if she tried to cash it again, she could be arrested. At that point, Rayanne became nervous and said she actually received it from her daughter. Murillo recorded the check in the store computer and marked it so that any Money Mart cashier would easily recognize it as counterfeit, and then returned the check to Rayanne. Rayanne put the rejected check in the envelope in her grandmother's bedroom with the three checks she had given to her mother. Rayanne testified that she did not tell anyone about the check being rejected.

The Attempt to Cash the Travelers Checks

On the evening of December 12, 2007, Traci retrieved from her mother's bedroom the three travelers checks she had been given earlier. Appellant and Jones were each given a travelers check and, later that same night, appellant, Traci and Jones went to the Black Oak Casino to gamble. They brought the travelers checks with them. All three were aware that Rayanne had received the checks in the mail in an unmarked envelope with no return address, letter or other explanation. They arrived at the casino at about 10:00 p.m.

Shortly after midnight, which was the early morning of December 13, 2007, appellant approached the casino's cashier window and tried to cash one of the travelers checks. The cashier, Lisa Huckabee, did not cash the travelers check because it was not made payable to the casino but to some other person who was not present (i.e., Rayanne). Huckabee confirmed with her supervisor that the check was not acceptable, returned to the cashier's window and gave the check back to appellant. She explained to him why the casino could not accept it. Appellant took the check and walked away.

A few minutes later, but before he learned that appellant's check had been rejected by the casino, Jones approached a different cashier and attempted to cash one of the travelers checks. The cashier, Melissa McDaniel, looked at the travelers check and realized that it was counterfeit. Among other things, she noticed that the word "Travelers" was misspelled twice but elsewhere spelled correctly, and there was no watermark or magnetic security strip. Additionally, the travelers check stated on its face that the acceptance procedure was printed on the reverse side, but nothing was printed on the back of the check. Casino security

was contacted, and security personnel verified with
American Express that the check was not valid and then
contacted the sheriff.

Sheriff's Deputy Brandon Lowry arrived on the scene and
separately interviewed appellant, Traci and Jones.
Casino safety officer Eli Wingo was present during
portions of the interviews. When Traci was asked if she
was suspicious that the travelers checks might have
been counterfeit, she responded that "'at first she
was, but 500 bucks is 500 bucks.'" All three suspects
acknowledged the checks originally came from Rayanne,
and they knew that Rayanne had received them in the
mail in an unmarked envelope, but all three denied any
knowledge that the checks were counterfeit.

On December 13, 2007, Sheriff's Detective Eric Erhardt
went to the residence of appellant and Traci in Modesto
to look for any type of computers or printers along
with any additional travelers checks. When he arrived,
Sarah was present at the residence. Detective Erhardt
asked her if she had any of the travelers checks in her
possession. Sarah admitted that she had two checks in
her purse and he removed the two checks. Detective
Erhardt asked her if she had attempted to cash any of
the checks and she responded that she had not done so
because "she didn't believe that they were real." Sarah
also told Detective Erhardt that she knew her sister,
Rayanne, had attempted to cash one of the checks at the
Money Mart and the check had been rejected.

Appellant, Traci and Jones each testified on their own
behalf at trial. Appellant testified that Traci handed
him one of the checks on the same night they went to
the casino. He was aware that the checks came from
Rayanne, who had received them in the mail in an
unmarked envelope. He explained that he attempted to
cash the travelers check when his other gambling money
ran out. He testified he had no idea that the check was
counterfeit.

Jones testified that he had no knowledge the travelers
check given to him by Traci was counterfeit. He said he
did not know anything about travelers checks, had never
seen one before, and was nearly illiterate and not
knowledgeable of such things. He said Traci gave it to
him as a gift because he had helped out with repairs in
the past, and he did not have any reason to believe the
check was not valid. A character witness testified on
Jones's behalf, indicating that although Jones was
illiterate, gullible and naïve, he was an honest man.

Traci testified that she received the checks from
Rayanne, knowing that Rayanne had gotten them in the
mail in an unmarked envelope, but that she (Traci) had

1    no idea they were counterfeit.

2  (Lodged Doc. B, 2-5.)

3       VI.  Jury Instruction concerning Intent Required for
             Burglary
4
        Petitioner argues that the instruction given by the trial
5
   court concerning the intent required for burglary denied his
6
   right to a jury trial and to due process of law guaranteed by the
7
   Sixth and Fourteenth Amendments.  Petitioner contends that the
8
   jury was instructed on a legally impossible theory pursuant to a
9
   deficient instruction that resulted in structural error.  He
10
   further argues that it is impossible to gauge from the other
11
   instructions and the verdicts whether the burglary conviction was
12
   based on the legally impossible theory of guilt, and thus
13
   Petitioner has suffered a deprivation of his right to due process
14
   of law and a fair trial under the Fourteenth Amendment.
15
        A.   The State Court Decision
16
        The decision of the DCA concerning Petitioner's claim was as
17
   follows:
18
         II. The Trial Court Did Not Err in its Instruction to the
19            Jury on the Specific Intent Element of Burglary

20       Appellant next contends the trial court prejudicially
         erred in its jury instruction on the specific intent
21       element for second degree burglary. We now consider
         that issue.
22
         The trial court instructed the jury, in relevant part,
23       as follows: "The defendants are charged in Count I with
         burglary, violation of section 459 [ ] of the [P]enal
24       [C]ode. To prove that the defendants are guilty of this
         crime, the People must prove, one, the defendant
25       entered a building, and when he or she entered the
         building, he or she intended to commit the crime of
26       passing or attempting to pass a counterfeit document."
         The jury was also told that entering the building with
27       that specific intent would complete the crime of
         burglary in this case: "A burglary is committed if a
28       defendant entered with the intent to commit the crime

                                 11

of passing or attempting to pass a counterfeit document. The defendant does not need to have actually committed that crime if he or she entered with the intent to do so."

As the instructions correctly reflect, for purposes of the crime of burglary it is sufficient if the perpetrator intended to commit a theft or felony at the time he or she entered the premises; the targeted crime need not be actually carried out. (*People v. Montoya* (1994) 7 Cal.4th 1027, 1041-1042; *People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 166; § 459.) The particular instructions in this case were given in light of the evidence that appellant may have entered the casino with the intent to commit the target crime of forgery. Forgery is defined in the Penal Code to include not only passing a counterfeit check with intent to defraud, but also attempting to pass a counterfeit check with intent to defraud. (See §§ 476 & 470, subd. (d).) With regard to appellant's purported target offense of forgery, the jury was instructed by the trial court on the "inten[t] to defraud" element of that crime as well as on the fact that forgery includes not only passing or using a counterfeit check, but also attempting to do so with such a fraudulent intent.

Appellant contends the trial court committed prejudicial error when it told the jury that the specific intent element for purposes of the burglary count would be satisfied if appellant "entered with the intent to commit the crime of passing or attempting to pass a counterfeit document" (italics added). The gist of appellant's logic runs as follows: If appellant intended only to attempt to commit an offense when he entered the casino, he must not have intended to actually commit that offense since an attempt by its very nature is an uncompleted target crime, and therefore the specific intent requirement for burglary would be lacking. That is, he asserts "there can be no burglary with the underlying intent of committing an attempted offense." We reject appellant's argument.

"When evaluating jury instructions, we follow familiar rules. 'Jury instructions must be read together and understood in context as presented to the jury. Whether a jury has been correctly instructed depends upon the entire charge of the court. [Citations.]' [Citation.] Jurors are presumed to be intelligent persons capable of understanding and correlating jury instructions. [Citation.] An erroneous instruction requires reversal only when it appears that the error was likely to have misled the jury. [Citations.]" *(People v. Brock* (2006) 143 Cal.App.4th 1266, 1277.)

Here, we have no difficulty concluding there was no

instructional error; and even if there was a lack of
precision in the instructions, the jury was not misled.
As noted, the Penal Code defines forgery to include
both the act of passing a fraudulent check as well as
the act of attempting to pass such a check with the
intent to defraud. (*See* §§ 476 & 470, subd. (d).)
Success in passing a counterfeit check is not essential
to the crime of forgery; the crime is committed (or
completed) even by the attempt to do so. *(See People v.
Williams* (1960) 186 Cal.App.2d 420, 425; *People v. Fork*
(1965) 233 Cal.App.2d 725, 731.) FN4 That is the gist
of what the trial court was conveying in its
instructions to the jury.

> FN4. An attempt occurs when a defendant
> specifically intends to commit the crime but
> his or her steps taken to further that intent
> are ineffectual or unsuccessful. (§ 21a;
> *People v. Medina* (2007) 41 Cal.4th 685, 694.)

In this context, we believe the jury likely correlated
the attempt language in the jury instructions to the
fact that the crime of forgery (the target offense for
purposes of the burglary count) may be committed by
even an attempt to pass a counterfeit document. Indeed,
the evidence presented to the jury clearly showed that
appellant entered the casino with the travelers check
in his possession and proceeded to attempt to cash it,
but his effort to do so was unsuccessful. Thus, the
jury was properly informed that even appellant's
unsuccessful attempt to cash the check could constitute
the crime of forgery.

Moreover, the particular wording used by the trial
court to describe the specific intent element of the
burglary count (i.e., an intent "to commit the crime of
passing or attempting to pass a counterfeit document")
was reasonably clear and the jury would not have taken
it to mean the opposite of what it says (i.e., that
appellant did not intend to actually commit such crime
or crimes). Jurors are presumed to be intelligent
persons with a measure of common sense. If, at the time
of his entry into the casino premises, appellant
intended to try and defraud the casino by a plan to
cash the counterfeit travelers check, it is absurd to
suggest that he, at that same time, intended not to
cash the counterfeit travelers check. Similarly, we do
not believe the jury could reasonably have understood
the instructions to mean that appellant somehow
intended to attempt, but not actually to commit, the
crime of passing a counterfeit check. No reasonable
jury would conclude from the instructions given that
the specific intent described therein was an intention
to deliberately fail or fall short of the desired goal
of cashing the fraudulent check.

We note that under the preliminary provisions and general definitions of section 21a, an attempt to commit a crime is said to consist of (1) a specific intent to commit the crime, and (2) a direct but ineffectual act done toward its commission. In more ordinary parlance, to attempt something means "[t]o try to do, make, or achieve." (Webster's II New College Dict. (1995 ed.) p. 72.) Clearly, what the statutory definition and the ordinary meaning of the word have in common is the idea that the person involved seeks to actually accomplish the thing he or she is attempting to do, which is the object of his or her intention, and we have no reason to believe the jury understood the term in any other way here.

Appellant relies on *People v. Iniguez* (2002) 96 Cal.App.4th 75 (*Iniguez*), which held that a conspiracy to commit an attempted murder is not a crime:

> "The conduct defendant pleaded to, conspiracy to commit attempted murder, is a conclusive legal falsehood. This is because the crime of attempted murder requires specific intent to actually commit the murder, while the agreement underlying the conspiracy pleaded to contemplated no more than an ineffectual act. No one can simultaneously intend to do and not do the same act, here the actual commission of a murder. Defendant has pleaded to a nonexistent offense." (*Iniguez*, *supra*, 96 Cal.App.4th at p. 79, fn. omitted.)

Appellant likens the instant case to that of *Iniguez* because of the trial court's instruction that appellant committed burglary if he entered the casino with intent "to commit the crime of passing or attempting to pass a counterfeit document." Appellant claims the instruction allowed the jury to convict him based on intent to commit an attempt, which he argues is a legal falsehood under the reasoning of *Iniguez.*

We find the present case to be distinguishable from the situation in *Iniguez* for two important reasons and thus its holding is not applicable here. First, as explained at length above, the jury instructions here were reasonably clear under all of the circumstances and did not mislead the jury in regard to special intent needed for burglary in this case. Second, the target crime in the present case differs significantly from the unique conspiracy context of *Iniguez*. An attempt to intentionally pass a counterfeit check constitutes the completed crime of forgery. (§ 476.) In contrast, the conduct pled to by the defendant in *Iniguez* (*i.e.*, a conspiracy to commit an attempted murder) was not itself a crime. Thus, here, we do not have the

14

1
2
3

> situation where the intent involved was potentially to commit an act that was not itself criminal. For these reasons, we reject appellant's contention that *Iniguez* is applicable or that it mandates reversal of the burglary conviction.

4
5

> In conclusion, we hold the jury was adequately instructed regarding the special intent requirements for purposes of the burglary count against appellant.

6   (Lodged Document B, 9-13.)

7           B.  Legal Standards

8           When a conviction is challenged in a proceeding pursuant to

9   28 U.S.C. § 2254 on the basis of error in jury instructions, a

10  district court's review is informed by two clearly established

11  legal principles.

12          First, the United States Supreme Court has held that a

13  challenge to a jury instruction solely as an error under state

14  law does not state a claim cognizable in federal habeas corpus

15  proceedings.  Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).  A

16  claim that an instruction was deficient in comparison to a state

17  model or that a trial judge incorrectly interpreted or applied

18  state law governing jury instructions does not entitle one to

19  relief under § 2254, which requires violation of the

20  Constitution, laws, or treaties of the United States.  28 U.S.C.

21  §§ 2254(a), 2241(c)(3).

22          Second, the only basis for federal collateral relief for

23  instructional error is that the infirm instruction or the lack of

24  instruction by itself so infected the entire trial that the

25  resulting conviction violates due process.  Estelle, 502 U.S. at

26  72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see, Donnelly v.

27  DeChristoforo, 416 U.S. 637, 643 (1974) (noting that it must be

28  established not merely that the instruction is undesirable,

                               15

erroneous or even "universally condemned," but that it violated
some right guaranteed to the defendant by the Fourteenth
Amendment). Further, the instruction may not be judged in
artificial isolation, but must be considered in the context of
the instructions as a whole and the trial record. Estelle, 502
U.S. at 72.

In addition, in reviewing an ambiguous instruction, it must
be determined whether there is a reasonable likelihood that the
jury has applied the challenged instruction in a manner that
violates the Constitution. Estelle, 502 U.S. at 72-73
(reaffirming the standard as stated in Boyde v. California, 494
U.S. 370, 380 (1990)). The Court in Estelle specifically noted
that the Court had defined the category of infractions that
violate fundamental fairness very narrowly, and that beyond the
specific guarantees enumerated in the Bill of Rights, the Due
Process Clause has limited operation. Id. at 72-73.

Moreover, even if there is instructional error, a petitioner
is generally not entitled to habeas relief unless the error is
prejudicial. The Supreme Court has held that the harmless error
analysis applies to instructional errors as long as the error
does not categorically vitiate all the jury's findings. Hedgpeth
v. Pulido, 555 U.S. 57, 61 (2008) (citing Neder v. United States,
527 U.S. 1, 11 (1999) (quoting in turn Sullivan v. Louisiana, 508
U.S. 275 (1993) concerning erroneous reasonable doubt
instructions as constituting structural error)). In Hedgpeth v.
Pulido, the Court cited its previous decisions that various forms
of instructional error were trial errors subject to the harmless
error analysis, including errors of omitting or misstating an

1  element of the offense or erroneously shifting the burden as to

2  an element.  Hedgpeth, 555 U.S. 60-61.

3      C.  Analysis

4      Here, the DCA addressed the challenged instructions, which

5  were that 1) the prosecution had to prove that when Petitioner

6  entered the casino, he intended to commit the crime of passing or

7  attempting to pass a counterfeit document, and 2) entry of the

8  building with the intent to pass or to attempt to pass the

9  counterfeit check was sufficient for guilt of burglary even if

10 the target offense was not ever completed.  Citing state

11 statutes,[1] the state court concluded that these instructions were

12 correct statements of state law because the target offense itself

13 was defined by California law as including both passing a

14 counterfeit check and attempting to pass a counterfeit check.

15 Thus, instructing the jury that an intent to commit either

16 offense was sufficient for guilt accurately reflected state law.

17     This Court accepts a state court's interpretation of state

18 law.  Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1996).  In a

19 habeas corpus proceeding, this Court is bound by the California

20 Supreme Court's interpretation of California law unless the

21 interpretation is determined to be untenable or a veiled attempt

22 to avoid review of federal questions.  Murtishaw v. Woodford, 255

23 F.3d 926, 964 (9th Cir. 2001).

24     Here, the DCA's interpretation is tenable, and there is no

25 suggestion of any attempt to avoid review of federal questions.

26 Thus, there is no cognizable claim before this Court regarding

27

28

       [1]  The DCA cited Cal. Pen. Code §§ 476 and 470(d).

1  error in the definition of the offense or the application of
2  state law concerning the elements of the offense.

3      Further, with respect to the applicability of People v.
4  Iniguez, 96 Cal.App.4th 75 (2002), Iniguez involved the
5  application of state law concerning the relationship between the
6  inchoate offenses of conspiracy and attempt.  Any question
7  concerning the DCA's treatment of Iniguez is a matter of state
8  law and thus does not present a claim that is cognizable in this
9  proceeding.

10     Petitioner had argued before the DCA that the jury could
11 have understood the instructions as stating that Petitioner could
12 be convicted of burglary even if he did not intend to commit the
13 target offense.  He reasoned that entering with the intent to
14 attempt to pass the check was inconsistent with an intent
15 actually to pass the check, and thus the jury could have
16 understood that proof of guilt was sufficient even if there was
17 an absence of an intent to commit the target offense.

18     In this regard, to the extent that the instructions could be
19 considered to be ambiguous, the DCA applied a standard of
20 decision that was consistent with the test stated by the Supreme
21 Court in Estelle, namely, whether in light of all the
22 instructions and the record as a whole there is a reasonable
23 likelihood that the jury has applied the challenged instruction
24 in a way that violates the Constitution.  Estelle, 502 U.S. at
25 72-73.

26     The DCA determined that in light of all the instructions and
27 the record, the instruction in question was not likely to have
28 misled the jury.  The DCA noted that the plain and ordinary

18

meaning of the term "attempt" was to try to do something, and thus the instruction itself was reasonably clear.  The DCA, therefore, concluded it was not likely that the jury would have understood the instruction to mean the opposite of what it said or that it referred to a situation where defendant did not intend actually to commit the target offense.

The DCA considered the instruction that the target offense of attempting to pass a check required the intent to defraud. The DCA noted that in light of the language of the instruction and the evidence, it was likely that the jury correlated the language concerning attempt to the fact that the target offense of forgery may be committed by even an unsuccessful attempt to pass a counterfeit document.  Considering the nature and scope of the DCA's analysis, there is no basis for concluding that the DCA's decision was contrary to, or an unreasonable application of, clearly established federal law.

Petitioner appears to argue that he was deprived of his right to have the jury determine every material issue presented by the evidence, and to a jury determination that he was guilty beyond a reasonable doubt of every element of the crime he was alleged to have committed.  (Pet. 7.)  Petitioner cites Sandstrom v. Montana, 442 U.S. 510 (1979).

In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement.  See, Sandstrom v. Montana, 442 U.S. 510, 520-521 (1979).  An instruction creating a presumption of malice that has the effect of shifting the burden of proof on intent to the defendant violates due process.

1  <u>Sandstrom v. Montana</u>, 442 U.S. at 512.

2      Petitioner appears to contend that the issue of his state of

3  mind was removed from the jury's consideration because it was

4  legally impossible for him to intend to commit the offense of

5  attempting to pass a counterfeit document.  However, as the

6  foregoing analysis shows, it was not a legal impossibility

7  because state law defined the target offense to include an

8  attempt to pass the check.  Further, it was not reasonably likely

9  that the jury applied the challenged instructions in a way that

10 violates the Constitution or suggests any prejudicial effect on

11 Petitioner or his defense.

12     In sum, Petitioner has not demonstrated that the jury

13 instructions so infected Petitioner's entire trial that

14 Petitioner's conviction violates due process.  Petitioner has not

15 shown that the state court decision was contrary to, or an

16 unreasonable application of, clearly established federal law.  As

17 Petitioner has not shown that he is entitled to relief in this

18 proceeding, it will be recommended that the petition for writ of

19 habeas corpus be denied.

20     VII.  <u>Certificate of Appealablity</u>

21     Unless a circuit justice or judge issues a certificate of

22 appealability, an appeal may not be taken to the Court of Appeals

23 from the final order in a habeas proceeding in which the

24 detention complained of arises out of process issued by a state

25 court.  28 U.S.C. § 2253(c)(1)(A); <u>Miller-El v. Cockrell</u>, 537

26 U.S. 322, 336 (2003).  A certificate of appealability may issue

27 only if the applicant makes a substantial showing of the denial

28 of a constitutional right.  § 2253(c)(2).  Under this standard, a

20

petitioner must show that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.  Miller-El v. Cockrell, 537 U.S. at 336 (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)).  A certificate should issue if the Petitioner shows that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in any procedural ruling.  Slack v. McDaniel, 529 U.S. 473, 483-84 (2000).

In determining this issue, a court conducts an overview of the claims in the habeas petition, generally assesses their merits, and determines whether the resolution was debatable among jurists of reason or wrong.  Id.  It is necessary for an applicant to show more than an absence of frivolity or the existence of mere good faith; however, it is not necessary for an applicant to show that the appeal will succeed.  Miller-El v. Cockrell, 537 U.S. at 338.

A district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  Rule 11(a) of the Rules Governing Section 2254 Cases.

Here, it does not appear that reasonable jurists could debate whether the petition should have been resolved in a different manner.  Petitioner has not made a substantial showing of the denial of a constitutional right.

Accordingly, it will be recommended that the Court decline to issue a certificate of appealability.

21

VIII.   <u>Recommendations</u>

In accordance with the foregoing, it is RECOMMENDED that:

1)   The petition for writ of habeas corpus be DENIED; and

2)   Judgment be ENTERED for Respondent; and

3)   The Court DECLINE to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections shall be served and filed within fourteen (14) days (plus three (3) days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:    March 8, 2012**                              **/s/ Sheila K. Oberto**
                                        UNITED STATES MAGISTRATE JUDGE